UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARNOLD'S WINES, INC.
d/b/a KAHN'S FINE WINES & SPIRITS, et al.,

Plaintiffs,

-against-

DANIEL B. BOYLE, et al.,

Defendants,

-and-

CHARMER INDUSTRIES, INC., et al.

Intervenor-Defendants,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 28 07

06 Civ. 3357 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 (2006) seeking to

invalidate certain provisions of New York's Alcoholic Beverage Control Law ("ABC

Law") that reserve to in-state retailers the exclusive right to sell, deliver, and transport

wine directly to New York consumers. Plaintiffs seek a declaratory judgment that this

statutory scheme discriminates against interstate commerce in violation of the Commerce

Clause of the United States Constitution, Article I, Section 8, Clause 3. State defendants

and intervenor-defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure to dismiss the Amended Complaint. For the reasons set forth below, the

Court grants defendants' motions [36, 40].

**DISCUSSION**

Plaintiff Arnold's Wines, Inc., doing business as Kahn's Fine Wines & Spirits

("Kahn's"), is an out-of-state (Indiana) wine retailer that would like to sell its products

directly to New York consumers. Plaintiffs Joshua T. Block and Sharon Silber, New York residents, would like to be able to buy and receive wine from out-of-state retailers. Defendants are the New York State Liquor Authority and individual officials of the New York State Liquor Authority. In addition, two licensed New York wholesalers and an association of licensed New York retailers have been granted leave to appear as intervenor-defendants.

Plaintiffs, who are here concerned only with retail sales of wine, challenge the constitutionality of sections 100(1), 102(1)(a), and 102(1)(b) of the ABC Law. Together, these provisions require that all liquor sold, delivered, shipped, or transported to a New York consumer first pass through an entity licensed by the State of New York. Section 100(1) states, "No person shall manufacture for sale or sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this chapter." N.Y. Alco. Bev. Cont. Law § 100(1) (McKinney 2000 & Supp. 2006). Wine retailers in New York may apply for an off-premises license that will permit that retailer to ship wine directly to the residences of customers in New York, but out-of-state wine retailers are not eligible for such licenses.[1] (Compl. ¶ 14; State Defs.' Mot. to Dismiss 13.) The other two provisions of the ABC Law challenged by plaintiffs make it illegal to ship wine into the State to an unlicensed entity (such as a consumer).[2]

---

[1] Although both plaintiffs and defendants note that New York will not grant retail off-premises licenses to out-of-state retailers, the parties do not point to the provision of New York law responsible for this restriction.

[2] Section 102(1)(a) prohibits alcoholic beverages from being "shipped into the state unless the same shall be consigned to a person duly licensed hereunder to traffic in alcoholic beverages . . . ." N.Y. Alco. Bev. Cont. Law § 102(1)(a). Section 102(1)(b) states that "no common carrier or other person shall bring or carry into the state any alcoholic beverages, unless the same shall be consigned to a person duly licensed hereunder to traffic in alcoholic beverages . . . ." *Id.* § 102(1)(a).

These provisions are part of the three-tier licensing structure established in New York for the sale and distribution of alcoholic beverages. The three tiers refer to: (1) the producer; (2) the distributor or wholesaler; and (3) the retailer. Under the three-tier system, a producer sells its wine to a licensed in-state wholesaler, who pays excise taxes and delivers the wine to a licensed in-state retailer. The retailer, in turn, sells the wine to consumers and, where applicable, collects sales taxes. *See* Federal Trade Commission, *Possible Anticompetitive Barriers to E-Commerce: Wine* 5 (July 2003) ("*FTC Wine Report*"), *available at* http://www.ftc.gov/os/2003/07/winereport2.pdf. In New York, out-of-state wineries and in-state wineries are permitted to bypass the three-tier system to ship directly to consumers. *See* N.Y. Alco. Bev. Cont. Law §§ 79-c, 79-d.[3] The ABC Law requires that all other out-of-state producers and sellers ship to State-licensed wholesalers within the three-tier system.

## I.    Dormant Commerce Clause

Plaintiffs argue that this ban on direct sales to consumers by out-of-state wine retailers discriminates against interstate commerce in violation of the Commerce Clause. (*See* Compl. ¶¶ 11–17, 23; Pls.' Opp'n to Intervenor-Defs.' Mot. to Dismiss 1–2.) The Commerce Clause provides Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. It is well established that this affirmative grant of authority implies a "negative" or "dormant" constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce. *See Dennis v. Higgins*, 498 U.S. 439, 447 (1991)

---

[3] Section 79-c was added following the Supreme Court's decision in *Granholm v. Heald*, 544 U.S. 460 (2005), in which the Supreme Court declared invalid a New York law permitting in-state, but not out-of-state, farm wineries to make direct sales to consumers. See id. The decision in *Granholm* is discussed in more detail *infra*.

3

(holding that the Commerce Clause is "also a substantive restriction on permissible state regulation of interstate commerce" (internal quotation marks omitted)). The Supreme Court has held that "the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." *Or. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994) (internal quotation marks omitted). A state law discriminates against interstate commerce if it mandates "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter"; such laws are "virtually per se invalid." *Id.*; *see New Energy Co. v. Limbach*, 486 U.S. 269, 274 (1988) (noting that "state statutes that clearly discriminate against interstate commerce are routinely struck down"). A facially discriminatory law may be redeemed only if the State can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy*, 486 U.S. at 278; *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) ("Facial discrimination by itself may be a fatal defect" and "at a minimum . . . invokes the strictest scrutiny").

Although the challenged provisions of the ABC Law are not discriminatory in the sense that they treat liquor manufactured in-state (domestic liquor) and out-of-state (imported liquor) the same, the provisions mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" by blocking out-of-state retailers' access to the retail wine market in New York. *Or. Waste Sys.*, 511 U.S. at 99; *see Lewis v. BT Inv. Managers*, 447 U.S. 27, 39 (1980) (holding that a statute burdens interstate commerce if "it overtly prevents foreign enterprises from

4

competing in local markets"). "For more than a century the Supreme Court has treated
the grant of commerce power to Congress as a prohibition against border-closing laws
and other efforts by states to discriminate against interstate commerce." *Bridenbaugh v.
Freeman-Wilson*, 227 F.3d 848, 851 (7th Cir. 2000); *see Cooley v. Board of Port
Wardens*, 53 U.S. (12 How.) 299, 319 (1851); *Welton v. Missouri*, 91 U.S. 275, 280
(1875); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951); *General Motors Corp. v.
Tracy*, 519 U.S. 278, 287, (1997). When viewed through the lens of traditional
Commerce Clause principles, then, the challenged provisions appear to "directly burden[]
interstate commerce in a manner that contravenes the Commerce Clause's implicit
limitation on state power." *Lewis*, 447 U.S. at 44; *see Bridenbaugh*, 227 F.3d at 851 ("If
the product were cheese rather than wine, Indiana would not be able either to close its
borders to imports . . . .").

Ordinarily, "once a state law is shown to discriminate against interstate commerce
'either on its face or in practical effect,' the burden falls on the State to demonstrate both
that the statute 'serves a legitimate local purpose,' and that this purpose could not be
served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131,
138 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). At this motion-to-
dismiss stage, however, defendants argue that, as a matter of law, the ban on direct
shipment of wine by out-of-state retailers is a valid exercise of New York's power under
Section 2 of the Twenty-first Amendment. If the Court were to decide that the Twenty-
first Amendment does not immunize the statute from dormant Commerce Clause attack,
plaintiffs' claim would survive the motion to dismiss. *See Peoples Super Liquor Stores,
Inc. v. Jenkins*, 432 F. Supp. 2d 200 (D. Mass. 2006) (proceeding with a similar analysis).

## II.   Twenty-first Amendment

Section 2 of the Twenty-first Amendment states: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const., amend. XXI, § 2.   Although Section 2 "gives the States wide latitude to regulate the importation and distribution of liquor within their territories," *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 584 (1986) (citing *California Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 107 (1980)), "[i]t is well settled that the Twenty-first Amendment did not entirely remove state regulation of alcohol from the reach of the Commerce Clause." *Id.* (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984)).

In *Bacchus Imports, Ltd. v. Dias*, for example, the Supreme Court struck down a Hawaii statute that exempted locally produced liquor from excise taxes, rejecting the State's argument that Hawaii's discrimination against out-of-state liquor was authorized by the Twenty-first Amendment. *See Bacchus*, 468 U.S. at 274–276.   "The central purpose of the [Amendment]," the Court said, "was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.* at 276.   The Supreme Court has also rejected state "price affirmation" statutes that required liquor producers to affirm that they were not charging lower prices for liquor in other states. *See Healy v. Beer Institute*, 491 U.S. 324, 343 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 581–84 (1986).   In *Healy*, Justice Scalia noted in his concurrence that the statute's "invalidity is fully established by its facial discrimination against interstate commerce," and that this "discriminatory character eliminates the immunity afforded by

6

the Twenty-first Amendment." *Healy*, 491 U.S. at 344 (Scalia, J., concurring). Together, these cases stand for the proposition that, "[l]ike other provisions of the Constitution," the Twenty-first Amendment and the Commerce Clause "each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 332 (1964).

The Supreme Court's most recent opinion at the intersection of the Twenty-first Amendment and the Commerce Clause is *Granholm v. Heald*, 544 U.S. 460 (2005), in which the Court struck down laws in Michigan and New York that permitted in-state, but not out-of-state, wineries to make direct sales to in-state consumers. Both sides argue that *Granholm* is directly applicable to the instant case and compels a ruling in their favor. The Court agrees that *Granholm* is controlling and will review the Supreme Court's analysis in that case before considering its application to the present dispute. First, however, because the challenged provisions are integral to New York's three-tier system for the regulation of alcohol, a brief overview of the three-tier system is appropriate.

## A.    Three-Tier System

On the eve of Prohibition, thirty-three states had policies favoring prohibition. *See* Mihir A. Munshi, *Share the Wine—Liquor Control in Pennsylvania*, 58 U. Pitt. L. Rev. 507, 509 (1997). Many other States employed licensing schemes in lieu of prohibition, with the authority to regulate often fluctuating among state, county, and municipal excise boards. *Id.* With the start of national Prohibition in 1920, the States shared in the exercise of police power over alcohol with the federal government, with the responsibility for enforcement falling largely on the federal government. Prohibition

proved not to be a successful policy for liquor control, however. By 1933, "a huge, sprawling, and illegal industry for producing and distributing alcoholic beverages . . . existed. Composed of uncountable numbers of small, independent distributors and producers, and some larger ones, for 14 years this industry had, as everyone noted, kept the U.S. well supplied with alcohol." Harry Gene Levine, *The Birth of American Alcohol Control*, 12 Contemp. Drug Probs. 63, 83 (1985). On December 5, 1933 the Nation ended its experiment with Prohibition; Section 1 of the Twenty-first Amendment repealed the Eighteenth Amendment, and Section 2 explicitly authorized States to regulate alcohol within their borders. *See Brown-Forman*, 476 U.S. at 582 ("New York may regulate the sale of liquor within its borders . . . .").

In January 1933, a month before Congress sent to the States the proposed Twenty-first Amendment, Governor Lehman of New York asked John D. Rockefeller Jr. to serve on a committee to plan liquor legislation in the event of repeal. Levine, *supra*, at 83. Although Rockefeller declined the invitation, he commissioned his own study of various methods of alcohol regulation. *Id.* at 84. On October 6, 1933, two months before the final State ratified repeal, Rockefeller announced the publication of the study as a volume titled *Toward Liquor Control*, popularly known as the Rockefeller Report. *Id.* at 86–87; *see* Raymond B. Fosdick & Albert L. Scott, *Toward Liquor Control* (1933). The Rockefeller Report set forth detailed guidelines for the implementation of two alternative plans for liquor control: state-run monopolies and state licensing systems. Levine, *supra*, at 89, 93. State legislators, faced with the difficult task of creating an entire system of liquor control almost overnight, adopted the "authoritative and virtually unchallenged plans" of the Rockefeller Report. *Id.* at 95; *FTC Wine Report* 6. By 1937, eighteen

8

States had implemented state monopolies and twenty-six States had implemented licensing systems; the remainder were dry. *See* Robert H. Skilton, *State Power Under the Twenty-first Amendment*, 7 Brook. L. Rev. 342, 345–346 & nn. 18–19 (1937). Almost all of the States that implemented the licensing system "limit[ed] the issuance of retail, wholesale, and manufacturing licenses to residents of the state or to domestic corporations." *See* Note, *Economic Localism in State Alcoholic Beverage Laws-Experience Under the Twenty-First Amendment*, 72 Harv. L. Rev. 1145, 1148 (1959) (hereinafter "*Economic Localism*"); *see also Granholm*, 544 U.S. at 518 n.6 (Thomas J., dissenting) (listing the laws of twenty States that had residency, citizenship, or physical presence requirements for licensing in the 1930s).

The licensing system selected by the majority of the States, the three-tier system, is still used to regulate alcohol in most States. *See id.* at 350; *FTC Wine Report* 5–6. The principal purpose of the three-tier system was to preclude the re-emergence of a "tied" system between producers and exclusive retailers, which was widely believed to have enabled organized crime to dominate the industry. *See* Alix M. Freedman & John R. Emshwiller, Vintage System: Big Liquor Wholesaler Finds Change Stalking Its Very Private World, *Wall St. J.*, Oct. 4, 1999, at A1. In addition, "[b]y requiring producers to sell wine through wholesalers, states hoped to collect taxes more efficiently and to limit alcohol sales to minors. . . . Finally, some states may have sought to promote temperance by keeping the price of alcohol artificially high." *FTC Wine Report* 6.

New York was one of the states that chose to implement the three-tier licensing scheme for the regulation and distribution of alcohol.[4] *See* N.Y. Alco. Bev. Cont. Law §§

---

[4] Indiana also elected to implement the three-tier system. *See* Skilton, *supra*, at 346 n.19.

9

1–164 (McKinney 2000 & Supp. 2006); Skilton, *supra*, at 346 n.19. The core of this system includes the provisions challenged by plaintiffs: ABC Law § 102(1)(a) provides that no liquor may be shipped into New York unless the recipient is licensed, and § 102(1)(b) prohibits common carriers and others from delivering liquor to anyone other than a licensed recipient. *See* N.Y. Alco. Bev. Cont. Law §§ 102(1)(a)–(b) (McKinney 2000 & Supp. 2006). This licensing scheme provides a system for oversight of the financial relationships among manufacturers, wholesalers, and retailers, *see id.* §§ 101, 105(16)–(17), 106(13)–(14), and the manner in which manufacturers, wholesalers, and retailers price goods and make sales, *see id.* §§ 101-aa, 101-b(2)–(3). The State Liquor Authority may inspect any premises where alcoholic beverages are manufactured, sold, or stored, as well as the books and records that must be kept on licensed premises. *See id.* §§ 18(4), 103(7), 104(10), 105(15), 106(12). New York also claims that requiring alcohol to pass through the three-tier system allows the State to collect taxes more efficiently and to decrease the sale of alcohol to minors. *See id.* § 65 (sales to minors); N.Y. Tax L. §§ 420–445, 1105(a), (d) (excise and sales taxes); 20 N.Y.C.R.R. §§ 60.1 *et seq.* (excise tax).

Direct shipment laws, such as those challenged by plaintiffs here, are integral to maintaining centralized control over alcohol sales because they ensure that every drop of alcohol flows through the three-tier system. Currently, thirty-three States permit some form of direct shipping by out-of-state wineries to consumers, but only twelve States permit out-of-state wine *retailers* to ship directly to consumers. *See* Wine Institute, Offsite State Shipping Laws, http://wi.shipcompliant.com/Home.aspx? SaleTypeID=1 (last visited August 15, 2007); Press Release, Specialty Wine Retailer's

10

Ass'n, New Wine Retailer Association Formed to Ensure Consumer Access to National Wine Market (Mar. 6, 2006), available at *http://www.specialtywineretailers.org/ forms/SWRA_Intro_Release_FINAL.pdf.*

The question of the constitutionality of the three-tier system arose in *North Dakota v. United States*, 495 U.S. 423 (1990), although the Court's holding did not rest on Commerce Clause grounds. Pursuant to a congressional statute authorizing the military to purchase liquor from outside the State, the Department of Defense developed a purchasing program to buy liquor in bulk directly from the nation's primary distributors. *See id.* at 427. Because direct shipments of liquor from out-of-state distributors to military bases within North Dakota bypassed the State's three-tier system, North Dakota required out-of-state shippers to file monthly reports and to affix a label to each bottle of liquor sold to a federal enclave for domestic consumption. *See id.* at 426. The extra reporting and labeling requirements increased the price of the alcohol shipped to North Dakota bases and proved sufficiently onerous for five companies to refuse to fill orders for those bases. *See id.* at 429. A plurality of the Court applied an intergovernmental immunities analysis to uphold the State regulations. *Id.* at 438–39 (plurality). The plurality also observed, however, that the challenged regulations fell "within the core of the State's power under the Twenty-first Amendment" because they were enacted "in the interest of promoting temperance, ensuring orderly market conditions, and raising revenue . . . ." *Id.* at 432 (plurality). In a concurring opinion, Justice Scalia added that the Twenty-first Amendment "empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed *in-state* wholesaler." *Id.* at 447 (Scalia, J., concurring) (emphasis added). Thus, five Justices in

*North Dakota* concluded that North Dakota's three-tier system was "unquestionably legitimate." *Id.* at 432.

## B.   *Granholm v. Heald*

The most recent Supreme Court case to discuss the three-tier system is *Granholm v. Heald*, 544 U.S. 460 (2005). In *Granholm*, the Court considered the constitutionality of Michigan and New York statutes that permitted in-state, but not out-of-state, wineries to bypass the three-tier system to ship wine directly to consumers. The Court employed a three-part analysis, asking: (1) whether the challenged laws were facially discriminatory; (2) whether the Twenty-first Amendment rescued the discriminatory statutes; and (3) whether the statutes advanced a legitimate local purpose that could not be served as well by nondiscriminatory alternatives.

With respect to the first element of the test, the *Granholm* majority had "no difficulty concluding" that the States' bans on direct shipping discriminated against out-of-state wineries. *Granholm*, 544 U.S. at 476. "The differential treatment requires all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers. These two extra layers of overhead increase the cost of out-of-state wines to Michigan consumers. The cost differential, and in some cases the inability to secure a wholesaler for small shipments, can effectively bar small wineries from the Michigan market." *Id.* at 473–74. The Court concluded that "[a]llowing States to discriminate against out-of-state wine 'invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.'" *Id.* at 473 (quoting *Dean Milk*, 340 U.S. at 356).

12

The majority next addressed the States' argument that Section 2 of the Twenty-first Amendment saved the challenged laws by removing state regulation of alcoholic beverages from the ambit of the Commerce Clause. In this portion of the opinion, the Court reviewed its cases interpreting a pair of pre-Prohibition statutes—the Wilson Act and the Webb-Kenyon Act—that influenced the drafting of Section 2. The Court explained that these pre-Prohibition cases "advanced two distinct principles." *Id.* at 476. One set of cases "held that the Commerce Clause prevented States from discriminating against imported liquor." *Id.* at 477. The other set of cases "held that the Commerce Clause prevented States from passing facially neutral laws that placed an impermissible burden on interstate commerce." *Id.*

Prior to the passage of the Wilson Act in 1890, the Supreme Court relied on the Commerce Clause to invalidate a number of state liquor regulations. *Id.* at 476. For example, in *Bowman v. Chicago & Northwestern R. Co.*, 125 U.S. 465 (1888), the Court considered an Iowa law that prohibited the manufacture and sale of intoxicating liquors in the State for all but medicinal, sacramental, or other limited purposes. To enforce this ban, the Iowa law also prohibited common carriers from transporting liquor into Iowa from another State without prior certification that the recipient of the liquor was authorized to sell the liquor. The Supreme Court struck down the law, explaining that even nondiscriminatory regulations "directly affecting interstate commerce" are prohibited by the Commerce Clause. *Bowman*, 125 U.S. at 496–97. *Bowman* reserved the question whether a State could ban the sale of imported liquor after it arrived in the State. The Court answered this question in *Leisy v. Hardin*, 135 U.S. 100 (1890). The Court explained that under *Bowman*, liquor moving in interstate commerce is immune

from state regulation, and that liquor could not be stripped of its interstate character until after the sale of the imported liquor in its original package. *Leisy*, 135 U.S. at 119. Relying on this since-rejected original package doctrine, *see Granholm*, 544 U.S. at 477, the Supreme Court ruled that a State could not ban the sale of imported liquor in its original package. *Leisy*, 135 U.S. at 124.

Under *Leisy*, States could ban the production and sale of domestic liquor, but they could not stop sales of imported liquor. *See Granholm*, 544 U.S. at 478. Congress stepped in to resolve this situation by passing the Wilson Act, which empowered States to regulate imported liquor "upon arrival in such State . . . to the same extent and in the same manner" as domestic liquor. *Id.* (quoting Act of Aug. 8, 1890, ch. 728, 26 Stat. 313 (codified as amended at 27 U.S.C. § 121)). Subsequently, however, the Supreme Court held that the Wilson Act did not authorize a State to prohibit importation of liquor for personal use. *See Rhodes v. Iowa*, 170 U.S. 412 (1898); *Vance v. W. A. Vandercook Co.*, 170 U.S. 438 (1898). In *Rhodes*, the Court revisited the same Iowa law that had been struck down in *Bowman*. The Court recognized that the Wilson Act allowed Iowa to ban the sale of imported liquor in its original package, at an earlier point than was permitted by the Commerce Clause under *Leisy*. *See Rhodes*, 170 U.S. at 420. However, the Court construed the words "upon arrival" in the Wilson Act to mean that state law could attach only after delivery to the recipient, and not while the liquor was in transit. *See id.* at 421. Because States could ban the sale of imported liquor, but not the importation itself, the decision in *Rhodes* permitted the mail-order liquor business to thrive. *Granholm*, 544 U.S. at 480.

14

Congress eventually closed this "direct-shipment loophole," *id.* at 481, by enacting the Webb-Kenyon Act of 1913. The Webb-Kenyon Act provides that the "shipment or transportation . . . of any . . . intoxicating liquor of any kind, from one State . . . into any other State . . . which . . . is intended . . . to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State . . . is hereby prohibited." Act of Mar. 1, 1913, ch. 90, 37 Stat. 699, 699–700 (codified as amended at 27 U.S.C. § 122). In *Clark Distilling Co. v. Western Maryland R. Co.*, 242 U.S. 311 (1917), the Supreme Court acknowledged that the Webb-Kenyon Act empowered States to regulate the shipment, receipt, and possession of liquor— regulation that imposes direct burdens upon interstate commerce in a manner that would otherwise violate the Commerce Clause. *See Clark Distilling*, 242 U.S. at 320, 321–23; *Granholm*, 544 U.S. at 482. At the same time, however, "[t]he Wilson Act reaffirmed, and the Webb-Kenyon Act did not displace, the Court's line of Commerce Clause cases striking down state laws that discriminated against liquor produced out of state. . . . States were required to regulate domestic and imported *liquor* on equal terms." *Granholm*, 544 U.S. at 483 (emphasis added).

In *Granholm*, the Supreme Court noted that "[t]he wording of § 2 of the Twenty-first Amendment closely follows the Webb-Kenyon and Wilson Acts," *id.* at 483 (quoting *Craig v. Boren*, 429 U.S. 190, 205–206 (1976)), and concluded that Section 2 restored to the States the Commerce Clause immunity provided by the Wilson and Webb-Kenyon Acts.[5] *See id.* ("§ 2 only restored to the States the powers they had under the Wilson and

---

[5] The Wilson Act has never been repealed and remains codified as amended at 27 U.S.C. § 121. The Webb-Kenyon Act was re-enacted by Congress after the Twenty-first Amendment was ratified and remains codified at 27 U.S.C. § 122.

Webb-Kenyon Acts."); *Craig v. Boren*, 429 U.S. 190, 205–206 ("The wording of § 2 of the Twenty-first Amendment closely follows the Webb-Kenyon and Wilson Acts, expressing the framers' clear intention of constitutionalizing the Commerce Clause framework established under those statutes."). Thus, "[t]he aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time." *Id.* at 484–85. The Court found its modern Section 2 cases to be consistent with this holding. *Id.* at 486–88. Accordingly, "[s]tate policies are protected under the Twenty-first Amendment when they treat *liquor* produced out of state the same as its domestic equivalent." *Id.* at 489 (emphasis added). Because the Michigan and New York statutes "involve[d] straightforward attempts to discriminate in favor of local producers" (and products), the Twenty-first Amendment did not insulate the statutes from Commerce Clause challenge. *Id.*

Having concluded that the States' direct-shipment laws were not authorized by the Twenty-first Amendment, the *Granholm* Court undertook the usual dormant Commerce Clause analysis, asking whether the discriminatory statutes advanced a legitimate local purpose that could not be served as well by nondiscriminatory alternatives. *See id.* at 489. Finding ample nondiscriminatory means by which New York and Michigan could achieve their stated goals of facilitating tax collection and preventing minors from consuming alcohol, the Supreme Court struck down the New York and Michigan laws as violative of the Commerce Clause. *Id.* at 493.

16

## C. Application of *Granholm*'s Holding to Plaintiffs' Claims

Plaintiffs concede that Section 2 authorizes the States to require all sellers of alcoholic beverages to obtain permits and that nothing in *Granholm* alters this result. (Compl. ¶ 22; *see* Pls.' Opp'n to State Defs.' Mot. to Dismiss 3); *see also State Bd. of Equalization of California v. Young's Market Co.*, 299 U.S. 59, 60–62 (1936) (acknowledging that a state licensing fee charged to wholesalers importing out-of-state beer was a "direct burden on interstate commerce" authorized by the Twenty-first Amendment), *overruled on other grounds by Granholm*, 544 U.S. at 485. Plaintiffs nevertheless argue that such licenses may not be reserved to in-state entities. They reason that, because state laws that discriminate against out-of-state products and producers are not shielded from Commerce Clause challenge by the Twenty-first Amendment, *see Granholm*, 544 U.S. at 489, state laws that discriminate against out-of-state wine retailers (or, for that matter, wholesalers) likewise are vulnerable to Commerce Clause attack.

Because in-state retailers are the last tier in the State's three-tier system, plaintiffs' challenge to the ABC Law's provisions blocking out-of-state entities from obtaining licenses to compete at this tier is clearly an attack on the three-tier system itself. *See Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006) (opinion of Niemeyer, J.) (observing that any "argument that compares the status of an in-state retailer with an out-of-state retailer—or that compares the status of any other in-state entity under the three-tier system with its out-of-state counterpart   is nothing different than an argument challenging the three-tier system itself"). However, the Supreme Court reaffirmed the

constitutionality of the three-tier system in *Granholm*, and therefore plaintiffs' challenge must fail.

As explained above, the precise question raised in *Granholm* concerned the constitutionality of an exception to the three-tier system in Michigan and New York's laws. In the course of addressing this question, however, the Supreme Court directly addressed the constitutionality of the three-tier system. *See Granholm*, 544 U.S. 488– 489. In defending their ban on direct sales by out-of-state wineries, Michigan and New York argued that the wineries were seeking "nothing less than the dismantling of New York's 70-year-old three-tier distribution system." Br. for Private Resp'ts, *Swedenburg v. Kelly*, No. 03-1274, 2004 WL 2138121, at \*12–\*13 (Sept. 23, 2004). The Supreme Court rejected this conclusion, stating:

> The States argue that any decision invalidating their direct-shipment laws would call into question the constitutionality of the three-tier system. This does not follow from our holding. . . . We have previously recognized that the three-tier system itself is "unquestionably legitimate." [*North Dakota*, 495 U.S. at 432.] [*See also id.* at 447] (Scalia, J., concurring in judgment) ("The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler"). State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent. The instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers. The discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment.

*Granholm*, 544 U.S. at 488–489.

Plaintiffs ask this Court to dismiss *Granholm*'s explicit endorsement of the three-tier system as dicta. (*See* Oral Argument Tr. (July 2, 2007), at 29–31.) But if dicta this be, it is of the most persuasive kind. In upholding the three-tier system, the Supreme Court acted intentionally to limit application of the nondiscrimination principle enunciated in *Granholm* to products and producers, as opposed to wholesalers and

retailers, a result consistent with prior holdings of the Court regarding the power of the States to regulate the distribution, importation, and transportation of alcohol within their borders. *See, e.g., North Dakota*, 495 U.S. at 432 (finding the state's regulatory system "within the core of the State's power under the Twenty-first Amendment"); *Capital Cities Cable v. Crisp*, 467 U.S. 691, 713 (1984) (describing the States' ability to directly regulate the sale or use of liquor within its borders as a "core § 2 power"); *Midcal*, 445 U.S. at 110 ("The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." (cited with approval in *Granholm*, 544 U.S. at 488)). Moreover, by directly addressing the three-tier system, *Granholm* reflects the "pragmatic effort" in recent Supreme Court cases "to harmonize state and federal powers." *Bacchus*, 468 U.S. at 275 (quoting *Midcal*, 445 U.S. at 109).

Other aspects of *Granholm* provide ample evidence that the Supreme Court's statements regarding the three-tier system are more than mere dicta. First, at oral argument, the Justices were clearly focused on whether a ruling in the wineries' favor would sound the death knell of the three-tier system.[6] Second, and more significantly, Justice Thomas, in a dissent joined by Chief Justice Rehnquist, Justice Stevens, and Justice O'Connor, berated "[t]he majority's reliance on the difference between discrimination against manufacturers (and therefore, their products) and discrimination against wholesalers and retailers." *Id.* at 521; *see id.* at 500–01. Although the dissent agreed with the majority that Section 2 restored the power conferred on the States in the Wilson and Webb-Kenyon Acts, *see id.* at 497, the dissent conducted its own analysis of

---

[6] *Granholm v. Heald*, Nos. 03-1116, 03-1120, 03-1274, Tr. of Oral Arg, 2004 WL 2937830, at *4–*7 (Nov. 7, 2004) (discussing three-tier system).

the history of the Webb-Kenyon Act to conclude that it authorizes the States to discriminate against out-of-state liquor. *Id.* at 500 (observing that the Webb-Kenyon Act prohibits the interstate shipment of liquor into a State "in violation of any law of such State," 27 USC § 122, and arguing that "any law of such State" "means any law, including a 'discriminatory' one"). Justice Thomas wrote, "The Court's concession that the Twenty-first Amendment allowed States to require all liquor traffic to pass through in-state wholesalers and retailers shows that States may also have direct-shipment laws that discriminate against out-of-state wineries." *Id.* at 522. While Justice Thomas' dissent possesses a certain force of logic, the five justice majority obviously disagreed on the scope of the States' power to discriminate against out-of-state wine and liquor. Nevertheless, all nine Justices agreed that the three-tier system is within the scope of Commerce Clause immunity granted the States by Section 2 of the Twenty-first Amendment and that state policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Id.* at 489 ("The three-tier system itself is unquestionably legitimate" (internal quotation marks omitted)); *id.* at 495 (Stevens, J., dissenting) ("Can it be doubted that a State might establish a state monopoly of the manufacture and sale of beer, and either prohibit all competing importations, or discourage importation by laying a heavy impost, or channelize desired importations by confining them to a single consignee?" (quoting *Young's Market*, 299 U.S. at 62–63)); *id.* at 517 (Thomas, J., dissenting) (noting the "widespread, unquestioned acceptance of the three-tier system of liquor regulation"). This aspect of the Court's holding is consistent with the understanding of the Twenty-first Amendment at the time it was ratified, when twenty-six States adopted the three-tier

system to regulate the transportation, importation, and use of liquor. *See discussion supra* at pages 8-11. Moreover, this Court is not aware of any pre-*Granholm* authority calling into question the legitimacy of state laws that limit licenses to retailers and wholesalers located within the state.[7] Rather, such licensing schemes have been viewed "as a necessary part of an effective regulatory scheme." *See Economic Localism* 1150. Thus it was hardly by accident that the *Granholm* majority quoted Justice Scalia's concurrence in *North Dakota* confirming a State's core power to require all liquor to be purchased from licensed in-state wholesalers. *Granholm*, 544 U.S. at 488-89. Can there be any doubt that the Court's demarcation of the constitutional exercise of state power under the Twenty-first Amendment applies as well to the plaintiff wine retailers in the instant case?

Because the Court finds that sections 100(1), 102(1)(a), and 102(1)(b) of New York's ABC Law are an integral part of the three-tier system upheld by the Supreme Court in *Granholm*, the Court concludes that these provisions are within the authority granted to New York by the Twenty-first Amendment. Having so ruled, the Court finds it unnecessary to undertake a dormant Commerce Clause analysis. There being no further basis for plaintiffs' challenge to the constitutionality of the ABC Law, the Complaint is dismissed.

---

[7] Post-*Granholm* courts have struck down residency requirements, however. In *Southern Wine & Spirits of Tex., Inc. v. Steen*, 486 F.Supp.2d 626, 633 (W.D. Tex. 2007), the district court, citing *Granholm,* struck down Texas's one-year durational residency and citizenship requirements for alcoholic-beverage permit holders and licensees. The plaintiff had applied for a permit to operate facilities physically located in Texas, however, so the district court did not decide the issue here, namely, whether a State may restrict liquor licenses to facilities physically located in the state. *See id.* at 629. Similarly, a district court in Massachusetts cited *Granholm* to strike down residency requirements for retail liquor licenses. *Peoples Super Liquor Stores, Inc. v. Jenkins*, 432 F. Supp. 2d 200, 217 (D. Mass. 2006).

## CONCLUSION

For the reasons stated above, the Court grants defendants' motions to dismiss [36,

40]. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: New York, New York
     September 5, 2007

Richard J. Holwell
United States District Judge

22